[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
APRIL 4, 2007
THOMAS K. KAHN
CLERK

_____

No. 06-12194

_____

D. C. Docket No. 04-00891-CV-ORL-22KRS

KENNETH LAMONTE WEBSTER,
USAF-ALI CASTLE,

Plaintiffs-Appellants,

versus

KEVIN BEARY, in his official capacity
as Sheriff of Orange County, Florida,
MICHAEL GRIGSBY, both individually
and in capacity as Deputy Sheriff
of Orange County, Florida,
ALEJANDRO FERRER, both individually
and in capacity as Deputy Sheriff
of Orange County, Florida,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

**(April 4, 2007)**

Before HULL and MARCUS, Circuit Judges, and BARZILAY,[*] Judge.

PER CURIAM:

This 42 U.S.C. § 1983 lawsuit, brought by plaintiffs Kenneth Lamonte Webster and Usaf-Ali Castle, arises out of a police shooting incident at a gas station. The district court granted summary judgment to the police defendants on qualified immunity grounds, and Webster and Castle appeal. After review and oral argument, we affirm.

## I. BACKGROUND

On the night of June 11, 2000, the Orange County, Florida Sheriff's Office conducted a special operation designed to locate stolen vehicles. As part of the operation, deputy sheriffs were instructed to drive around Orange County and run license plate numbers through their computers to determine whether the cars had been reported as stolen.

Defendants Michael Grigsby and Alejandro Ferrer, both Orange County Deputy Sheriffs, were among the officers participating in this operation. Sergeant Grigsby was driving a marked patrol car and was wearing a standard Orange County Sheriff's Office uniform, while Deputy Ferrer was driving an unmarked

---

[*]Honorable Judith M. Barzilay, Judge, United States Court of International Trade, sitting by designation.

2

blue minivan and was wearing civilian clothes.[1]

At approximately 11:30 p.m., Orange County Deputy Sheriff Dominick Galiano came into contact with a vehicle that had been reported stolen, and he radioed for assistance. Galiano followed the vehicle to a residence on Rose Boulevard and transmitted the address over his police radio. The transmission was heard by both defendant officers, Sergeant Grigsby and Deputy Ferrer. According to Sergeant Grigsby, the address was that of a "known drug house." Deputy Galiano further transmitted that the vehicle contained two black male occupants, one of whom entered the residence. Deputy Galiano then transmitted that the vehicle had departed the Rose Boulevard residence and proceeded to the parking lot of a gas station on Texas Avenue. Defendants Grigsby and Ferrer each observed the suspect vehicle pull into the gas station, where it parked at the gas pumps behind another vehicle already parked there. The suspect vehicle's engine remained on.

The suspect vehicle was driven by plaintiff Webster. Plaintiff Castle sat in the right front passenger seat. According to Webster, he had rented the vehicle for

---

[1]Deputy Ferrer claims that he also was wearing a black smock with the words "Orange County Sheriff" printed in large white letters on the front and back. However, Webster and Castle dispute that Ferrer was wearing any clothing that identified him as a police officer. For purposes of this opinion, which addresses whether Sergeant Grigsby and Deputy Ferrer are entitled to qualified immunity, we take the facts in the light most favorable to Webster and Castle. See Vinyard v. Wilson, 311 F.3d 1340, 1343 n.1 (11th Cir. 2002).

$50 cash, for three days, from a woman named "Maureen."[2] Webster and Castle admit that they had been smoking marijuana on the day in question, and in fact, they went to the gas station in part because Webster had the "munchies." Webster testified that he did not think he was still under the influence of marijuana by the time he and Castle arrived at the gas station; however, Castle testified that he believed they probably were still feeling the effects of the marijuana at that time.

In any event, after Sergeant Grigsby and Deputy Ferrer observed Webster park the suspect vehicle at the gas station, they moved to apprehend Webster and Castle. Sergeant Grigsby pulled behind Webster's car, but Grigsby did not activate the overhead lights on his marked patrol car because he did not want to eliminate the element of surprise. Meanwhile, Deputy Ferrer pulled his unmarked minivan in front of Webster's car, on the opposite side of the pumps at which Webster was parked. Grigsby and Ferrer each exited their vehicles and approached Webster's vehicle with their weapons drawn—Grigsby from behind Webster's vehicle, and Ferrer from the front and slightly to the side.[3]

Ferrer contends that he made eye contact with Webster, who then looked backwards over his shoulder in the direction of Grigsby. Ferrer further contends

---

[2]Ms. Maureen Kalkstein reported the vehicle as stolen.

[3]Grigsby undisputedly was armed with his service weapon. Ferrer maintains he held a shotgun, but Webster and Castle claim that Ferrer held a handgun. We accept Webster and Castle's assertion for purposes of this opinion.

4

that he shouted "Orange County Sheriff's Office" while pointing his weapon at the vehicle. Webster and Castle, however, assert that they are not sure they heard Ferrer say anything at all, and Webster denies that he ever looked backwards, either by turning his head or looking in the car's mirrors. Webster testified that he would not have left or tried to drive away if he had known that Ferrer was a police officer, but he feared that Ferrer was planning to rob either him or the gas station, and he "just wanted to be safe" and to leave the area as quickly as possible.

It is undisputed that Webster reacted to seeing Ferrer by immediately placing the car in reverse, although there is not precise agreement as to how long the car was in reverse and how far backwards the car moved. According to Ferrer and Grigsby, Webster put the car in reverse and "began to accelerate in Sergeant Grigsby's direction at a quick pace." Similarly, Deputy Sean McCormack, who observed the incident, stated that he observed Webster's vehicle back up at "an accelerated pace." Deputy Steven Knapp, who also observed the incident, averred that Webster's vehicle "lurched back as if the driver . . . had hit the gas pedal to back up quickly," and further stated that Webster backed up "aggressive[ly]" and "rapidly."

Webster himself testified that he put the vehicle in reverse for two to three seconds, and although he was not sure how far backwards the vehicle moved, he

5

maintained that "it was not that far." Webster admitted, however, that the car did not simply idle backwards after he placed it in reverse. Instead, Webster testified that while the car was in reverse, he gave the car "some gas to get out of there quickly." Again, Webster maintains that he did not look backwards or in his mirrors while he had the car in reverse.

Castle testified that he was looking down when the incident happened, and when he heard Webster curse, he looked up. At that point, according to Castle, Webster was putting the car in reverse. Castle testified that once Webster had the car in reverse, he hit the gas "just a little bit and [then hit] the brakes." According to Castle, the vehicle moved back "probably . . . an inch."

Immediately after placing the car in reverse, Webster put the car in drive and pulled forward. According to Webster, he heard two gunshots as soon as his vehicle started moving forward.[4] The car then drove forward in a semicircle to the right and essentially crashed into the corner of the gas station building.

According to Grigsby, he had intended to announce himself as a police officer as he approached Webster's car, but he did not have time because the car began moving backwards towards him. Grigsby contends that at the moment

---

[4]The precise timing of the gunshots is disputed. Grigsby contends that the vehicle was still moving backwards when he fired his weapon, and after he fired, Webster's vehicle continued to travel backwards for a short distance and then moved forward.

Webster's vehicle moved towards him at what he perceived to be a high rate of speed, he believed his life to be in "imminent danger" because he thought that Webster intended to run him over.[5] In response to the perceived threat from Webster's car, Grigsby fired two shots from his service weapon. Ferrer also fired his weapon, based on his belief that "the driver was attempting to run Sergeant Grigsby over with his vehicle." Although Ferrer's shot struck the driver's side door of Webster's vehicle, at least one of Grigsby's shots struck Webster in the left shoulder. Castle was not shot. After Webster's car came to rest at the corner of the gas station building, both Webster and Castle were arrested.

In June 2004, Webster and Castle filed this § 1983 suit against Sergeant Grigsby, Deputy Ferrer, and Kevin Beary, the Sheriff of Orange County.[6] Webster and Castle contend that Grigsby and Ferrer violated their Fourth Amendment rights to be free from excessive force.[7]

The district court granted defendants' motions for summary judgment,

---

[5]Grigsby estimates that he was less than six feet away from Webster's vehicle at the time of the incident. Additionally, Grigsby asserts that at the time of the incident, he was aware of at least two other instances in which Orange County Deputy Sheriffs had been struck and killed in the line of duty by stolen vehicles driven by suspects.

[6]Beary is sued only in his official capacity.

[7]With regard to their claim against Beary, Webster and Castle contend that he "intentionally, knowingly, and recklessly failed to instruct, supervise, control and discipline" Grigsby and Ferrer "in their duties to refrain from: unlawfully using or promoting use of unreasonable and excessive force."

concluding that defendants were entitled to qualified immunity because Grigsby and Ferrer did not violate the constitutional rights of Webster and Castle. Webster and Castle timely appealed.

## II. DISCUSSION

Webster and Castle contend that the district court erroneously failed to consider all of the evidence before it, and further erred in construing the evidence in the light most favorable to defendants. Webster and Castle contend that because of those errors, the district court incorrectly granted qualified immunity to defendants. We disagree with Webster and Castle.[8]

Qualified immunity protects government officials sued in their individual capacities as long as their conduct "'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Vinyard v. Wilson, 311 F.3d 1340, 1346 (11th Cir. 2002) (citation omitted). An officer is entitled to qualified immunity if his actions were objectively reasonable; that is, "if an objectively reasonable officer in the same situation could have believed that the force used was not excessive." Id. "'The purpose of this immunity is to allow government officials to carry out their discretionary duties

---

[8]We review the district court's grant of summary judgment de novo, applying the same legal standards as the district court. We draw all inferences in favor of the non-movants. See Robinson v. Arrugueta, 415 F.3d 1252, 1254-55 (11th Cir. 2005).

without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law.'" Id. (citation omitted).

To receive qualified immunity, an officer must first show that he was acting within the scope of his discretionary authority. Id. Here, it is undisputed that Sergeant Grigsby and Deputy Ferrer were acting in the scope of their discretionary authority.

Because it is undisputed that Grigsby and Ferrer were acting in the scope of their discretionary authority, the burden shifts to Webster and Castle to establish that the qualified immunity defense does not apply. See id. There is a well-established two-part test for this inquiry. First, we must determine whether the facts alleged, taken in the light most favorable to plaintiffs, establish that Sergeant Grigsby and Deputy Ferrer violated plaintiffs' constitutional rights. See id. Second, if plaintiffs suffered a violation of a constitutional right under their version of the facts, we must determine whether that right was clearly established at the time the violation occurred. See id.

The Fourth Amendment's protection against unreasonable searches and seizures encompasses the right to be free from the use of excessive force during an arrest. Id. at 1347. However, the determination of whether the manner of arrest

9

was reasonable must be "judged on a case-by-case basis from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Id. (quotation marks and citations omitted). A court should consider several factors in evaluating an excessive force claim, including: "'(1) the need for the application of force; (2) the relationship between the need and amount of force used; and (3) the extent of the injury inflicted.'" Draper v. Reynolds, 369 F.3d 1270, 1277-78 (11th Cir. 2004) (footnote and citation omitted). The need for the application of force is measured by: (1) the severity of the crime; (2) the danger to the officer or others; and (3) the risk of flight by the suspect. See Vinyard, 311 F.3d at 1347.

In this case, we agree with the district court that the facts, even when viewed in the light most favorable to plaintiffs, do not support a finding that Sergeant Grigsby and Deputy Ferrer violated plaintiffs' constitutional rights. Webster and Castle were under suspicion of grand theft auto, and additionally, Grigsby and Ferrer were aware that Webster and Castle had visited a known drug house just prior to arriving at the gas station. Grand theft auto is obviously a serious crime, see Ramirez v. Castro, 365 F.3d 755, 769 (9th Cir. 2004), and, in addition, we have previously recognized that drug traffickers are often armed, see, e.g., Carr v. Tatangelo, 338 F.3d 1259, 1262 n.1 (11th Cir. 2003). Moreover, from the perspective of a reasonable officer on the scene, it obviously appeared that Webster

10

and Castle were a flight risk, given that Webster himself concedes that he tried to drive away when he saw Ferrer, and wanted to "get out of there quickly."

The contested issue on appeal is whether a reasonable officer on the scene would have believed that Webster was attempting to run Sergeant Grigsby over with the vehicle when he drove the car backwards. Grigsby and Ferrer argue that the district court correctly concluded that they reasonably believed Grigsby's life was in danger, which justified their use of deadly force and the serious shooting injury suffered by Webster. Webster and Castle, by contrast, contend that the district court erred in concluding that it was reasonable for Sergeant Grigsby and Deputy Ferrer to have believed that Grigsby's life was in danger. Webster and Castle specifically rely on Castle's testimony that the car moved backwards "probably . . . an inch." According to Webster and Castle, the district court impermissibly ignored Castle's testimony in this regard, thereby construing disputed evidence in the light most favorable to defendants.

We disagree with Webster and Castle. The district court found, in pertinent part, that:

> it is undisputed that Webster drove the vehicle in reverse and arguably towards the direction where Sergeant Grigsby was standing. Plaintiffs' own testimony is that Webster placed the vehicle he was driving in reverse once he saw a man, who we now know to be Deputy Ferrer, approach the vehicle. Moreover, Webster[] states that he was in a "hurry" to get out of the area, further corroborating the

11

officers' testimony that the suspect vehicle moved in a quick and aggressive manner while it was in reverse.

(Emphasis and footnote omitted).

In our view, the district court's holding was not contradictory to, and did not impermissibly ignore, Castle's testimony. Castle's testimony was simply that the car moved backwards "probably . . . an inch." Nothing in Castle's testimony contradicts the district court's findings that "Webster drove the vehicle in reverse" and that "Webster placed the vehicle he was driving in reverse once he saw . . . Deputy Ferrer." Indeed, Castle's testimony actually supports the district court's statement that it is "undisputed that Webster drove the vehicle in reverse." Similarly, we disagree with plaintiffs' contention that Castle's testimony contradicts the district court's finding that Webster's vehicle "moved in a quick and aggressive manner while it was in reverse." We see no reason why, even accepting that Webster's vehicle moved "probably . . . an inch," the vehicle could not have also "moved in a quick and aggressive manner." Each of the four police officer witnesses and Webster—who admitted that he was in a hurry to leave and did not merely back up, but in fact gave the car gas when it was in reverse—gave testimony consistent with the district court's finding that the vehicle moved backwards in a "quick and aggressive manner."

12

Additionally, this Court has reviewed the surveillance video of the incident.[9] While the precise distance traveled by Webster's vehicle certainly cannot be determined by watching the video, Castle's estimate that the car backed up "probably . . . an inch" is simply unreasonable. In reviewing a motion for summary judgment, we are only compelled to take <u>reasonable</u> inferences in favor of the non-movant. See <u>Tinker v. Beasley</u>, 429 F.3d 1324, 1326 (11th Cir. 2005); <u>Kesinger v. Herrington</u>, 381 F.3d 1243, 1247 (11th Cir. 2004). "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment." <u>Kesinger</u>, 381 F.3d at 1247. No reasonable jury could conclude, after watching the videotape, that Webster drove his car backwards "probably . . . an inch." Indeed, it is particularly notable, in light of the video and the other witness testimony, that Castle only testified that the car moved backwards "<u>probably</u> . . . an inch." Obviously, Castle was unable to unequivocally

---

[9]We note that before the district court, Webster and Castle argued that the surveillance video supported Webster's testimony that Sergeant Grigsby discharged his weapon only <u>after</u> Webster began to move the car forward. However, on appeal, plaintiffs do not discuss this point, instead only arguing that the district court erroneously failed to credit Castle's testimony that the car moved backwards approximately one inch. Moreover, the Court agrees with the district court that the video is inconclusive with regard to whether Grigsby fired while Webster's vehicle was going backwards or forwards. And in any event, the Court further agrees with the district court that, even if we accept plaintiffs' possibly-abandoned contention that Grigsby fired after Webster's car began to move forward, the uncontradicted evidence still establishes that the entire incident occurred in mere seconds and that in those few seconds, Grigsby and Ferrer reasonably perceived Grigsby's life was in danger on the basis of Webster having aggressively backed his vehicle towards Grigsby, regardless of whether Grigsby fired while the vehicle was still backing towards him or whether he fired a split-second thereafter.

13

state that the car moved backwards one inch, and instead, could only estimate the distance.

But even if we accept Castle's testimony that the car reversed "probably . . . an inch," we find instructive, as did the district court, our recent case of Robinson v. Arrugueta, 415 F.3d 1252 (11th Cir. 2005), cert. denied, __ U.S. __, 126 S. Ct. 1063 (2006), with regard to the question of whether a reasonable officer in the same situation would have believed that deadly force was necessary. In Robinson, Arrugueta, a special agent on a drug task force, followed a suspect vehicle that had been identified as carrying a heroin supplier. 415 F.3d at 1253-54. Arrugueta, driving an unmarked vehicle, followed the suspect vehicle as it stopped two feet behind a civilian car waiting at a traffic light. Id. at 1254. Arrugueta exited the car and positioned himself between the suspect vehicle and the civilian vehicle. Id. Arrugueta pointed his gun at the suspect, who was sitting somewhere between the front right passenger seat and the driver's seat, verbally identified himself as "Police," and told the suspect to put his hands up. Id. The suspect made eye contact with Arrugueta; defied the order to raise his hands; grinned; and the car slowly began to move forward at a speed of one to two miles per hour. Id. Arrugueta shot and killed the suspect.

We concluded that Arrugueta's use of deadly force under those

circumstances did not violate the suspect's constitutional rights, stating that while "[e]ven if in hindsight the facts show that Arrugueta perhaps could have escaped unharmed . . . a reasonable officer could have perceived that [the suspect] was using [his vehicle] as a deadly weapon. Arrugueta had probable cause to believe that [the suspect] posed a threat of serious physical harm." Id. at 1256. Similarly, in this case, we believe it was objectively reasonable for Sergeant Grigsby and Deputy Ferrer to have concluded that Webster posed a threat of serious physical harm to Grigsby. Webster undisputedly backed his car towards Grigsby in a quick and hurried manner as Grigsby stood less than six feet behind Webster's car. Grigsby and Ferrer, with their guns already drawn and under the belief that they were dealing with not only suspected automobile thieves but also possibly drug traffickers, reacted in an objectively reasonable manner given the totality of the tense and uncertain circumstances, even if their reaction was, in hindsight, arguably less-than-ideal.

### III. CONCLUSION

For the foregoing reasons, we affirm the district court's grant of summary judgment to defendants.

**AFFIRMED.**

15