# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 10-1375

_____

Ricky Kidd,                                    *
                                               *
          Appellant,                           *
                                               *   Appeal from the United States
     v.                                        *   District Court for the
                                               *   Western District of Missouri.
Jeff Norman,                                   *
                                               *
          Appellee.                            *


_____

Submitted: April 11, 2011
Filed: August 29, 2011

_____

Before BYE, COLLOTON, and GRUENDER, Circuit Judges.

_____

BYE, Circuit Judge.

     A Missouri jury found Ricky Kidd guilty of first-degree murder. He received a sentence of life imprisonment without the possibility of parole. After exhausting his state court remedies, Kidd filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. In his petition, Kidd alleged a Schlup[1] "gateway" claim of actual innocence hoping to resurrect ineffective-assistance-of-counsel claims which had been procedurally defaulted in his post-conviction proceedings. Applying this court's definition of what constitutes "new" evidence under Schlup, see Amrine v. Bowersox,

_____

[1]Schlup v. Delo, 513 U.S. 298 (1995).

238 F.3d 1023, 1029 (8th Cir. 2001) ("[E]vidence is new only if it was not available at trial and could not have been discovered earlier through the exercise of due diligence"), the district court[2] found Kidd failed to present new reliable evidence in support of his claim and denied the petition. Kidd obtained a certificate of appealability. On appeal, Kidd claims Amrine's definition of "new" evidence is inconsistent with Schlup, as well as the Supreme Court's intervening decision in House v. Bell, 547 U.S. 518 (2006). We conclude we are bound to follow Amrine, and therefore affirm the district court.

I

On February 6, 1996, at about 11:30 in the morning, George Bryant and Oscar Bridges were shot and killed at Bryant's home on Monroe Street in Kansas City, Missouri. After an investigation, Kidd and another man, Marcus Merrill, were charged with first-degree murder in the deaths of the two men. The evidence against Kidd and Merrill included testimony from Bryant's daughter, Kayla, who was four years old at the time of her father's death and present in the Bryant home when the shootings occurred. During the investigation, Kayla told police three men visited her father on the day of the shootings. Kayla picked Merrill out of a photo and video lineup as one of the three men involved in the shootings. She reaffirmed her previous identifications of Merrill during trial, but did not make an in-court identification of him. Kayla had picked Kidd out of a video lineup during the investigation, but failed to reaffirm her previous identification of him during trial. She also failed to make an in-court identification of Kidd.

The evidence against Kidd also included testimony from Richard Harris, one of Bryant's neighbors on Monroe Street. Harris testified he was walking down

_____

[2]The Honorable Scott O. Wright, United States District Judge for the Western District of Missouri.

Monroe Street at the time of the shootings, and saw Bryant's garage door opening while he passed Bryant's house. He saw Bryant duck underneath the garage door, heard Bryant yell for help, and saw a blood stain on the front of his shirt. Another man, who Harris identified as Gary Goodspeed, Jr.,[3] chased after Bryant. Goodspeed, Jr., caught Bryant and dragged him behind a car parked near Bryant's carport. Harris then saw a second pursuer exit the house. The second man walked over to where Bryant was lying wounded and shot Bryant twice with a gold .45 caliber handgun. During the investigation, Harris identified Kidd as the shooter in both a photo and video lineup. At trial, Harris testified he was "2001% sure" Kidd was the man who shot Bryant as he lay wounded near the carport. Appellant's App'x at 159.

During the investigation, the police questioned Kidd and his girlfriend, Monica Gray, about their whereabouts on the day of the shootings. Both indicated they picked up Kidd's car at his sister's place of employment in downtown Kansas City about 11:00 a.m. and then drove to the Jackson County (Mo.) Sheriff's office near Lake Jacomo (approximately a half hour from downtown Kansas City) to fill out an application to purchase a handgun. Kidd then visited his daughter, who lived with Kidd's former girlfriend, Kelly McGill, in Blue Springs, Missouri. Kidd's alibi was partially supported by the fact the Jackson County Sheriff's office ran a background check on Kidd's handgun permit application at 1:47 p.m. on the day of the shooting.[4]

At trial, Kidd presented evidence of his alibi through himself, his sister, his sister's coworker, his girlfriend, and his former girlfriend. The jury rejected Kidd's

---

[3]Despite Harris's identification of Goodspeed, Jr., as one of the men involved in the shootings, Goodspeed, Jr., was not charged along with Merrill and Kidd.

[4]The state argued the gun permit application could have been delivered the day before the shootings, or Kidd could have mailed or faxed the application or had someone else bring it to the Sheriff's office.

alibi, however, and found him guilty. The jury also found Merrill guilty. Both were sentenced to life in prison without the possibility of parole.

Kidd filed a direct appeal, which was unsuccessful. State v. Kidd, 990 S.W.2d 175, 186 (Mo. Ct. App. 1999). Kidd then brought a motion for post-conviction relief alleging his direct appeal counsel was ineffective for failing to argue Kidd should not have been sentenced as a prior offender. The Missouri Court of Appeals determined Kidd suffered no prejudice from appellate counsel's failure to challenge Kidd's prior offender status, and affirmed the denial of his motion for post-conviction relief. State v. Kidd, 75 S.W.3d 804, 815 (Mo. Ct. App. 2002). Notably, Kidd did not challenge the effectiveness of his trial counsel in his post-conviction action.

Kidd filed a timely habeas petition in federal district court. His habeas petition was initially dismissed, but he obtained new counsel and filed a successful Rule 60(b) motion to have the petition reopened. The amended petition raised eight new claims, including five claims alleging the ineffectiveness of Kidd's trial counsel. Kidd admitted all eight claims had been procedurally defaulted by failing to raise them in his state court post-conviction proceeding, but claimed he could overcome the default by showing his actual innocence. Specifically, Kidd alleged the three men who murdered Bryant and Bridges were Merrill, Gary Goodspeed, Jr., and Gary Goodspeed, Sr. Kidd had an affidavit from Merrill admitting his own role in the two murders, and stating Kidd was not involved. Merrill averred that Kidd "was mistaken for [Goodspeed, Sr.] since they favor." State App'x at 109.

The federal district court held an evidentiary hearing. Merrill testified on behalf of Kidd. He said he and the Goodspeeds committed the murders. Merrill gave a detailed description of the shootings, which matched the physical evidence found at the crime scene. Merrill stated Kidd was not involved. On cross-examination, however, Merrill admitted he and Kidd communicated with one another while the two were incarcerated after being found guilty. Merrill acknowledged he did not come

-4-

forward with his current story exonerating Kidd until he had exhausted all of his own appeals.

Several letters between Merrill and Kidd were introduced into evidence. In the first letter, Merrill sent a message to Kidd through another inmate which said Merrill could help Kidd get out of jail, but that in return, Merrill wanted to get out of jail as well. Kidd responded to Merrill, stating:

> If Sean [my attorney] can . . . play you decent (which I am confident he can) let say three to five more. Okay, you do the first 15 and let [the Goodspeeds] do their share of the rest. . . . Sean and I figured out that's where you could come in at. Indeed he is not the DA's office, but I do believe he can bring you within a range of time you can deal with.

Id. at 116-17.

Merrill admitted he understood this letter to mean if he testified for Kidd, he might get his life sentence reduced. Merrill responded to the letter by asking Kidd, "[a]lso it's needed to be known what is needed of me and what do I receive in return?" Id. at 124. Kidd responded: "I imagine the D.A. Office will, at least, want an outline of what you would be speaking on. . . . They would then be in a position to offer you what you want (within reason). . . . . at this stage you become valuable – more to them than to me." Id. at 119-20. Merrill admitted his testimony was based on his self interest in reducing his life sentence.

Kidd also testified at the hearing, restating his alibi evidence. In addition, Kidd claimed for the first time that Gary Goodspeed, Jr., contacted him the day before the murders. Kidd met with the Goodspeeds. During the meeting, Goodspeed, Sr., asked Kidd about Bryant's status in the drug community and asked Kidd if he would be interested in robbing Bryant. Kidd declined. Kidd further testified that Goodspeed, Sr., called Kidd on the night of the murders and said Bryant was dead, claiming

someone had robbed Bryant before Goodspeed, Sr., had a chance to do so. According to Kidd, Goodspeed, Sr., later met with him and admitted to the murders. On cross-examination, Kidd acknowledged not revealing any of this information to the police in the initial investigation, and admitted lying to the police and changing his story after he discovered he was a suspect.

Richard Harris also testified at the hearing. Although Harris still maintained Kidd was the shooter, Kidd's habeas counsel was able to discredit much of Harris's eyewitness testimony, pointing out discrepancies in his testimony and generally impeaching Harris's credibility. For example, Harris claimed Bryant's shooter had a red do-rag on his head with hair flowing out the back, but it was undisputed Kidd had a shaved head at the time of the murders. In addition, habeas counsel established that Harris frequently used drugs with Bryant, and Harris was upset with Bryant because Bryant wanted to kill Harris's best friend. Furthermore, on the morning of the shootings, Harris admitted smoking marijuana at a neighbor's house before walking past Bryant's house. Harris was walking back to his house to get some food because he was hungry, the implication being he was under the influence of marijuana at the time he witnessed Bryant's shooting. See Webster v. Beary, 228 F. App'x 844, 846 (11th Cir. 2007) (alluding to the connection between the use of marijuana and the "munchies").

In addition, habeas counsel elicited testimony from Harris indicating he observed both Goodspeeds and a third man enter Bryant's garage at the time Harris first walked to his neighbor's house earlier in the morning. Harris admitted he never revealed this information to the police during the investigation. Harris also acknowledged "editing" the information he revealed to the police because he believed himself to be a suspect in the shootings. Habeas counsel also established other witnesses never saw Harris in front of Bryant's house at the time of the shooting.

The district court denied Kidd's habeas petition. The district court noted "Kidd must identify new reliable evidence that was not available at the time of his trial" to support his claim of actual evidence. Addendum at 10. The district court then determined the only new evidence Kidd presented was Merrill's testimony, but found Merrill not to be a reliable witness. The district court specifically referred to "Merrill's blatant attempts to use his recent identification of the Goodspeeds as participants in the murders as a bargaining chip to reduce his own sentence" as the reason for rejecting Merrill's credibility. Id. at 8.

Kidd successfully obtained a certificate of appealability. This appeal followed.

II

On appeal, Kidd challenges the district court's limitation of Kidd's "new" evidence to Merrill's testimony, arguing the new evidence in support of a Schlup claim of actual innocence should include any evidence not presented at the original trial. Because Kidd challenges the legal standard used by the district court to review his habeas petition, we apply de novo review. Riddle v. Kemna, 523 F.3d 850, 851-52 (8th Cir. 2008).

Kidd claims a reexamination of all the evidence in his case establishes his actual innocence. In addition to the evidence recounted above, Kidd refers to additional evidence which could have been discovered and presented by his original trial counsel. Merrill traveled with the Goodspeeds from Georgia to Kansas City just a few days before the murders. Merrill shared an apartment with Goodspeed, Jr., in Georgia and was employed by Goodspeed, Sr. Merrill paid for a hotel room occupied by Goodspeed, Sr., the night before the murders. Goodspeed, Sr., rented a white Oldsmobile which matched the description of the vehicle several witnesses saw leaving Monroe Street immediately after the murders, occupied by three men. Testimony from an individual named Eugene Williams places Merrill and the two

Goodspeeds together the morning of the shootings. Williams also connects Merrill and the Goodspeeds to the weapons used in the murders, and knew the three men were going to rob someone that morning.

Kidd also points to additional evidence which implicates the Goodspeeds in the murders. Goodspeed, Jr., admitted to police he and Merrill had been to Bryant's house a few days before the murders and Kayla told police the men who shot her father had been to her house a few days before the murders. Bryant was known to refer to Gary Goodspeed, Jr., as his "brother" and Kayla twice told police on the day of the shootings that "Daddy's brother killed Daddy." Merrill and the Goodspeeds all gave consistent alibis placing themselves together with one another at the time of the shootings and making no mention of Kidd.

Kidd argues additional evidence also could have been presented at his original trial to strengthen his alibi. Susan Jordan, the dispatcher who processed his gun permit application, confirmed Kidd's application was received the same day as the shootings, refuting the state's claim at trial that Kidd may have delivered the application the day before the shootings. Video monitors near his sister's place of employment may have confirmed he was in downtown Kansas City at 11:00 am on the day of the shootings. Kidd says he made a phone call to his former girlfriend from a public pay phone near the Jackson County Sheriff's office shortly after dropping off his handgun permit application, and thus phone records may have confirmed the timeline of his alibi.

Finally, Kidd relies upon evidence his trial counsel could have used to impeach Harris's eyewitness identification. This evidence includes Harris's drug connections to Bryant, his use of marijuana at the time of the shootings, the inconsistencies between Harris's description of the shooter's appearance (the shooter "had a head of hair" and "wasn't bald-headed at the time") and Kidd's appearance (it is undisputed Kidd's head was shaved completely bald at the time of the shootings), and the

inconsistencies between Harris's description of the shootings and other eyewitnesses who did not see Harris outside Bryant's home at the time.

In Schlup v. Delo, the Supreme Court recognized a habeas petitioner could present a claim of actual innocence as a "gateway" to resurrecting procedurally defaulted claims of constitutional error which occurred in the underlying trial, but "[t]o be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial." 513 U.S. at 324. Kidd claims a full examination of all the evidence "old and new, incriminating and exculpatory," House v. Bell, 547 U.S. at 538 (internal quotation marks omitted), is required under Schlup. He claims the standard articulated in Amrine, which stated evidence is not "new" under Schlup unless it was "not available at trial and could not have been discovered earlier through the exercise of due diligence," 238 F.3d at 1029, is inconsistent with Schlup. He also argues Amrine's limitation on "new" evidence is inconsistent with House's requirement for the plenary review of all evidence, old and new.

Subsequent to Schlup, the circuits have disagreed upon what the Supreme Court meant by the "new" part of "new reliable evidence."[5] The Seventh and Ninth Circuits have interpreted this phrase to mean evidence is "new" for purposes of a Schlup analysis so long as it was "not presented" at trial. Gomez v. Jaimet, 350 F.3d 673, 679-80 (7th Cir. 2003); Griffin v. Johnson, 350 F.3d 956, 962-63 (9th Cir. 2003). The Third Circuit agrees with ours that evidence is "new" only if it was not available at the

---

[5]Kidd challenges the district court's determination that Merrill's testimony failed the "reliable" part of the Schlup standard, arguing the district court did not consider substantial evidence which supported the truthfulness of Merrill's testimony. The district court found Merrill was not credible, however, and this credibility determination is virtually unreviewable on appeal. See United States v. Cisneros-Gutierrez, 598 F.3d 997, 1103 (8th Cir. 2010).

time of trial through the exercise of due diligence.  See Hubbard v. Pinchak, 378 F.3d 333, 341 (3d Cir. 2004).

Both interpretations have been subject to some criticism.  The more restrictive definition articulated in Amrine has been criticized when the procedurally defaulted claim which a petitioner hopes to resurrect under Schlup is an ineffective-assistance-of-counsel claim against trial counsel for not discovering and presenting the exculpatory evidence that proves the petitioner's innocence:

> Yet arguably it is unfair to a petitioner to apply the Amrine statement of the law in cases in which the petitioner claims that he had had ineffective assistance of counsel by reason of his attorney not discovering exculpatory evidence when the petitioner is relying on that very evidence as being the evidence of actual innocence in a gateway case to reach the ineffective assistance of counsel claim.  As we have indicated, the rule that Amrine sets forth requires a petitioner, such as Houck, in effect to contend that his trial counsel was not ineffective because otherwise the newly presented evidence cannot be new, reliable evidence for Schlup purposes.

Houck v. Stickman, 625 F.3d 88, 94 (3d Cir. 2010).

This same problem was identified by the Seventh Circuit when it adopted the broader definition of "new" evidence as any evidence not presented at trial:

> Particularly in a case where the underlying constitutional violation claimed is the ineffective assistance of counsel premised on a failure to present evidence, a requirement that new evidence be unknown to the defense at the time of trial would operate as a roadblock to the actual innocence gateway.  Here, the very premise of the ineffectiveness claim is that the trial counsel knew of yet failed to present evidence that Gomez is alleging proves his innocence.  If procedurally defaulted ineffective assistance of counsel claims may be heard upon a showing of actual innocence, then it would defy reason to block review of actual innocence

based on what could later amount to the counsel's constitutionally defective representation. The burden for proving actual innocence in gateway cases is sufficiently stringent and it would be inappropriate and unnecessary to develop an additional threshold requirement that was not sanctioned by the Supreme Court.

Gomez v. Jaimet, 350 F.3d at 679-80 (footnote omitted).

The broad definition adopted by the Seventh and Ninth Circuits has been criticized as well, however, because "it seems to go beyond what is needed to remedy the particular problem that [the Seventh Circuit] identified because it is not anchored to a claim that there had been ineffective assistance of counsel by reason of counsel's failure to present evidence of the petitioner's innocence." Houck, 625 F.3d at 94. The Third Circuit suggested a modified approach in a situation such as the one faced by Kidd, where the procedurally defaulted claims include ineffective-assistance-of-counsel claims against trial counsel for not presenting the very evidence a petitioner claims proves his or her innocence:

Overall we are inclined to accept the Amrine definition of new evidence with the narrow limitation that if the evidence was not discovered for use at trial because trial counsel was ineffective, the evidence may be regarded as new provided that it is the very evidence that the petitioner claims demonstrates his innocence.

Houck, 625 F.3d at 94.

We conclude the district court correctly interpreted Amrine as requiring Kidd to come forward not only with new reliable evidence which was not presented at trial, but to come forward with new reliable evidence which was not available at trial through the exercise of due diligence. Whatever the merits of a modified approach in situations like the one faced by Kidd, our panel is not at liberty to ignore Amrine because we have already applied Amrine in situations like Kidd's. See Nance v.

-11-

Norris, 392 F.3d 284, 291 (8th Cir. 2004) (applying <u>Amrine</u>'s definition of new evidence even when one of the procedurally defaulted claims was an ineffective-assistance-of-counsel claim for failure to investigate, argue, and present evidence that allegedly would have proved the petitioner's innocence); <u>Osborne v. Purkett</u>, 411 F.3d 911, 919-20 (8th Cir. 2005) (same); <u>see also</u> <u>United States v. Reynolds</u>, 116 F.3d 328, 329 (8th Cir. 1997) ("One panel may not overrule another.").

We also reject Kidd's contention the Supreme Court's intervening decision in <u>House v. Bell</u> casts doubt on <u>Amrine</u>'s standard. In <u>House</u>, the Supreme Court specifically noted the State of Tennessee conceded the petitioner presented some new reliable evidence to open the gateway for a plenary consideration of all evidence, old and new. 547 U.S. at 537. The relevant dispute in <u>House</u> was which standard of review applied assuming a petitioner presented some new reliable evidence of innocence – <u>Schlup</u>'s "more likely than not" standard or the more stringent standard of review contained in the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). The Supreme Court held the <u>Schlup</u> standard still applied to petitioners seeking relief based on a claim of actual innocence post-AEDPA. <u>Id.</u> at 539. Thus, <u>House</u> does not help resolve the current circuit split on the meaning of "new" evidence in cases where one or more of the procedurally defaulted claims are claims involving trial counsel's alleged ineffectiveness in failing to discover or present evidence of the petitioner's innocence.

III

For the reasons stated, we affirm the denial of Kidd's habeas petition.

_____