# United States Court of Appeals

## For the Eighth Circuit

_____

No. 10-2434

_____

Terrick Terrell Nooner

*Plaintiff - Appellant*

v.

Ray Hobbs, Interim Director, Arkansas Department of Correction

*Defendant - Appellee*

_____

Appeal from United States District Court
for the Eastern District of Arkansas - Pine Bluff

_____

Submitted: June 16, 2011
Filed: August 24, 2012

_____

Before BYE and MELLOY, Circuit Judges, and SMITH CAMP[1], District Judge.

_____

MELLOY, Circuit Judge.

An Arkansas jury convicted Terrick Terrell Nooner of capital felony murder committed in the course of a robbery. He received a sentence of death. In state court, he unsuccessfully appealed his conviction. See Nooner v. Arkansas, 907 S.W.2d 677

_____

[1]The Honorable Laurie Smith Camp, United States District Judge for the District of Nebraska, sitting by designation.

(Ark. 1995) (opinion on direct appeal). He then unsuccessfully sought state and federal post-conviction relief. Nooner v. Arkansas, 4 S.W.3d 497 (Ark. 1999); Nooner v. Norris, 402 F.3d 801 (8th Cir. 2005). Finally, he received permission from our court to file a second petition for federal relief alleging new and previously unavailable evidence demonstrated that he was actually innocent and that the state had failed to disclose evidence favorable to the defense.

Nooner supported his second petition primarily with: (1) a recantation and statement from an important witness for the state, Antonia Kennedy, (2) a confession from a non-testifying co-defendant, Robert Rockett, and (3) expert testimony from a video-image expert. Antonia Kennedy and Rockett both assert that Rockett, rather than Nooner, committed the murder but that Nooner was present in a car outside the building where the murder took place. The expert, applying techniques developed after Nooner's trial for analyzing grainy and unclear video images (images that were admitted into evidence at the trial), opined that Nooner could not have been the purported murderer shown in the images because the height of the person in the image more closely matched Rockett's height than Nooner's.

The district court[2] granted Nooner two evidentiary hearings as to limited issues, but ultimately denied relief. The court found that Nooner's evidence was neither new nor previously unavailable. In the alternative, the court found that Nooner failed to demonstrate the requisite diligence in presenting his claims. In the further alternative, the court found that Nooner failed to make an adequate showing of actual innocence because the recantations were unreliable, the expert's opinion was unconvincing, and together with the trial evidence, Nooner's showing was insufficient to create the requisite likelihood that a jury would have found him not guilty. Nooner appeals, raising several issues. We affirm.

---

[2]The Honorable J. Leon Holmes, United States District Judge for the Eastern District of Arkansas.

## I. Background

### A. The Underlying Crime and the Trial

On March 16, 1993, at about 1:30 a.m., Scot Stobaugh entered a laundromat in Little Rock. Later that morning, he was found dead on the floor of the laundromat. He had been shot seven times.

The laundromat had three surveillance cameras. The three cameras recorded to one videotape with the feeds from the cameras recording only one view at any given moment. As a result, a video recording from the laundromat on the morning of March 16 does not contain a continuous depiction of events surrounding the murder. Rather, it shows bits and pieces of the events that unfolded after Stobaugh's arrival.

The tape shows a second man entering the laundromat shortly after Stobaugh. The second man appears to accost Stobaugh and walk Stobaugh towards the back of the laundromat. The tape shows the two men walking between two rows of machines and partially out of the camera's view. It then shows the second man possibly kicking at someone on the floor and out of view with the second man's left arm visible in the image and extended back but his right arm forward and out of the image. Stobaugh is out of the image, but based on the sequence of frames, Stobaugh would have been in front of the second man. The state argued that, given the second man's position, this frame could depict the moment of a shooting. The state also argued that the shooter was right handed and held the gun in the right hand not shown in the image.

All images are grainy and unclear, but certain aspects of the second man's clothing are visible as is the rough relative size of the second man compared to surrounding objects and compared to Stobaugh (subject to the limitation that both men are wearing baggy clothes and hats). The camera recording the most useful

-3-

images was mounted above the men in the rear of the laundromat, and analysis of the men's height and size is made difficult due to the camera's downward-facing perspective and due to the additional fact that the images appear to show both men while moving, standing with legs apart, or standing slightly stooped.

About ten days after the shooting, detectives focused their attention on Nooner based in part on statements Antonia Kennedy and Rockett gave to investigators. Officers had arrested Rockett for a robbery and murder at a convenience store in another town (the "Stax murder"). Rockett told police that Nooner was responsible for the Stax murder and for Stobaugh's murder. Although Rockett did not testify at Nooner's trial, he told officers that he and Nooner had been together on the night of Stobaugh's murder. According to Rockett, Rockett was driving a car Nooner had stolen, and the two men were looking for someone to rob when Nooner saw Stobaugh enter the laundromat. Rockett claimed Nooner told him to pull into the laundromat and then exited the car, entered the laundromat, walked Stobaugh to the back of the building, forced him to the floor, shot him seven times, kicked him, and took his checkbook, social security card, and $100 cash. Rockett stated that Nooner used a 0.22-caliber Ruger pistol the two men had stolen. Eventually Rockett pleaded guilty to first degree murder for his participation in Stobaugh's murder and was sentenced to sixty-five years' imprisonment consecutive to other sentences, including a life sentence for the Stax murder.[4]

Police also questioned a group of people associated with Nooner and Rockett. These same people ultimately testified at Nooner's trial. These witnesses included three sisters: Antonia Kennedy, Terri Kennedy, and Jazmaar Kennedy. Terri Kennedy was Nooner's girlfriend at the time of Stobaugh's murder and the mother of

---

[4]Although Rockett initially laid blame for the Stax murder on Nooner, investigators came to believe this accusation was false and prosecutors dropped charges against Nooner related to the Stax murder.

Nooner's child. Other witnesses included Johnny Martin and Isaac Warren, two men who had been with Nooner shortly before Stobaugh's murder or who had been around an apartment shared by the Kennedy sisters.

By any account, Antonia Kennedy was an important witness for the state at Nooner's trial. She testified consistently with a statement she had given to police during their investigation. She stated that Nooner told her the morning following the murder that he had killed the man in the laundromat. Her testimony was detailed; she recounted Nooner describing the victim's body as jerking after being shot and Nooner claiming to have kicked the body. According to her testimony, Nooner bragged about the killing. She quoted Nooner as stating that he "had to kill me a mother-f***er, shoot me a mother-f***er," and as stating, "Sister-in-law, when I shot him, his body was jerking, and I had to do it with him." Antonia Kennedy also stated that she had seen Nooner with a Ruger 0.22-caliber pistol before the murder and after the murder. She stated that, in the car Nooner and Rockett were using, she saw a checkbook containing a check with Stobaugh's name on it. Finally, she described Nooner's reaction to seeing the surveillance images in the news and his reaction to a news report that the crime may have been a random, gang-initiation event. According to Antonia Kennedy, Nooner asked if the images looked like him and acted "happy because the police wasn't [sic] on to him."

On cross examination, Antonia Kennedy admitted that she had given an inconsistent, video-recorded statement to a defense investigator after police initially interviewed her. Antonia Kennedy had told the defense investigator that her initial statement to police inculpating Nooner (the statement consistent with her subsequently provided trial testimony) was a lie she gave to police while in custody in Jonesboro, Arkansas, for a different matter. She claimed to the defense investigator that she lied to police because police said they would take care of charges against her in Jonesboro. At trial, however, she asserted that her trial testimony and statement to police were truthful and that her statement to the defense investigator

-5-

was false. The jury also learned that, after Antonia Kennedy spoke to police, she did not subsequently face any charges in Jonesboro. Finally, the jury learned that Antonia Kennedy had known Nooner from when the two were minors and had been together in a juvenile detention facility. Antonia admitted that the two had been sexually involved in the past, Nooner was in a relationship with Antonia's sister Terri Kennedy at the time of the murder, and Nooner had fathered a child with Terri Kennedy. Finally, Antonia identified Nooner as the man in the video.

Johnny Martin, Antonia Kennedy's ex-boyfriend, described his familiarity with Nooner and testified that he recognized Nooner in the surveillance images based on his face, coat, and hat. Martin claimed that he had seen Nooner wearing the same clothes the evening before the murder.

Isaac Warren testified that he saw Nooner in an apartment shared by the Kennedy sisters and that he had talked to Nooner at the apartment about purchasing a 0.22-caliber Ruger pistol. Warren stated that he saw Nooner with the gun before the murder but not after. Warren also testified that, after Nooner saw images from the crime scene, Nooner stated "they can't prove it" and "they had to shoot seven times."

Jazmaar Kennedy testified that she could identify Nooner in the surveillance video based on the coat and hat he was wearing because they belonged to her sister, Terri. Jazmaar had seen Nooner wearing those items the day before the murder.

An expert witness from the Arkansas Crime Lab testified that markings on five of the seven bullets and all seven shell casings were consistent with the bullets having been fired by a 0.22-caliber Ruger pistol with identifiable rifling patterns. The expert stated that the remaining two bullets were too damaged for analysis.

In addition, a police investigator testified that surveillance images were published in a local paper, thirteen callers contacted police to identify the assailant, and all thirteen callers identified persons other than Nooner.

Finally, Nooner called his stepfather and Terri Kennedy as defense witnesses. Both testified that Nooner was at his mother's and stepfather's house when Stobaugh was murdered. Nooner's theory of the case at trial, then, was not that he was involved as the driver and that Rockett shot Stobaugh. Rather, Nooner's theory as presented to the jury was that Nooner was at his mother's home in bed when Stobaugh was shot. Nooner's stepfather testified that Nooner was present at the home the night of the murder without Terri Kennedy and without Nooner's child. Terri Kennedy, however, testified that the child was at the stepfather's home with Nooner.

## B. Successive Habeas Proceedings

In the present petition, Nooner raises his claim of actual innocence for two purposes. First, he asserts actual innocence as a gateway issue to permit him to assert a Brady[5] violation alleging official concealment of evidence favorable to the defense. Second, he asserts actual innocence as a stand-alone claim citing the theory that the Supreme Court described, but did not rely upon, in Herrera v. Collins, 506 U.S. 390, 400 (1993).

In his direct appeal and initial state and federal collateral proceedings, Nooner did not raise any of the issues he raises in the present habeas proceedings. Further, he did not allege at any time that he was present at the laundromat and in the car. Rather, in his initial appeal and prior collateral proceedings, he presented various arguments and attacks upon the state's proof and the procedural integrity of the underlying proceedings. At no time prior to filing the present petition did he abandon

---

[5]Brady v. Maryland, 373 U.S. 83 (1963).

his version of the facts or his affirmative presentation of evidence at trial in which he asserted that he was wholly uninvolved in events at the laundromat and at home in bed at the time of Stobaugh's murder.

Nooner sought and received permission from our court to file the present petition, alleging that Antonia Kennedy recanted her testimony and placed Rockett and Nooner at the scene of the murder with Rockett as the shooter. He also alleged Rockett recanted, confessed to being the shooter, and placed Nooner at the scene.[3] Finally, Nooner alleged that a computer vision expert, Dr. Hartley, could accurately measure the height of the second man in the surveillance video based upon analytical techniques using the purportedly known height of the surveillance camera at the time of the shooting and also using input gleaned from a single image.

The state identified a competing expert, Dr. Russ, to address Dr. Hartley's methodology and conclusions. Ten days before a scheduled evidentiary hearing, however, Nooner deposed Dr. Russ and discovered substantial inconsistencies in his reported academic credentials. Based on these revelations, Nooner filed a motion seeking permission to subpoena Dr. Russ's academic and employment records. The district court denied the motion, stating that the evidence sought was merely impeachment evidence and would require the authorization of discovery with

---

[3]The Arkansas homicide statute defining felony murder provides "It is an affirmative defense to any prosecution under subdivision (a)(1) of this section for an offense in which the defendant was not the only participant that the defendant did not commit the homicidal act or in any way solicit, command, induce, procure, counsel, or aid in the homicidal act's commission." Ark. Code Ann. § 5-10-101(b). Although the state makes brief reference to Nooner's guilt even if he were merely the driver, neither the parties nor the district court fully developed these arguments below. We mention this argument and statute merely to explain the posture of this case and to explain why we do not address the obvious issue of accomplice liability as would typically preclude a showing of actual innocence under traditional standards for felony murder.

subpoenas to issue from three different district courts in other states with return dates of less than one week. Nooner later filed a motion pursuant to Daubert[4] seeking to exclude Dr. Russ's testimony. The district court denied the motion.

During the first evidentiary hearing, Nooner presented testimony primarily from Antonia Kennedy and Rockett. Nooner does not allege any procedural irregularities regarding the first hearing. Rockett testified that he (Rockett) was the second man in the video who shot Stobaugh and that Nooner was present, but remained in the car. In addition, Rockett provided a handwritten declaration dated August 8, 2007, as well as a typed declaration signed the same day. In the declarations, Rockett claimed to have fabricated his original statements to police in which he placed the blame on Nooner for Stobaugh's murder. According to Rockett, he misdirected police as a means to put pressure on Nooner so that Nooner would not inculpate Rockett in other crimes. Counsel for the state, however, exposed several inconsistencies in Rockett's testimony and recantations when questioning Rockett at the hearing. As accurately described by the district court:

> In the typewritten declaration, Rockett said that he never saw a wallet or a checkbook that belonged to Scot Stobaugh and that he had no idea where the story came from that those items were taken from the robbery and shooting at the . . . laundromat. He said that he never had them in the car that he was driving where someone else could have seen them. In the handwritten declaration, however, he said that he is the one who gave Nooner the checkbook to show to Antonia Kennedy. At the evidentiary hearing, he testified that the typewritten declaration was wrong on that point. In his handwritten declaration, Rockett said that he was lying in the floor of the Jacksonville [Arkansas] jail on March 30, 1993, when he heard Nooner talking to police and apparently placing the blame on him with regard to a robbery in Jacksonville [the robbery involving the Stax murder]. Rockett testified that it was at that time that he decided he needed to place the blame for the murder of Scot

---

[4]Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993).

Stobaugh on Nooner so as to keep Nooner from "snitching" on him. Apart from the fact that it makes no sense for Rockett to "snitch" on Nooner regarding the . . . laundromat [murder] in order to keep Nooner from "snitching" on him regarding the Stax robbery [and murder], Rockett's first statement regarding Nooner's murder of Scot Stobaugh was given on March 27, 1993, three days before Rockett says he first conceived of the idea of blaming Nooner for the Scot Stobaugh murder. Rockett's declarations are inconsistent and unpersuasive.

In addition, Rockett denied having told Antonia Kennedy near the time of the murder that he—rather than Nooner—killed Stobaugh. Further, Rockett admitted he was left handed. Finally, even though Rockett now claims to have been the killer, Rockett still maintains that Nooner bragged about killing Stobaugh. In this regard, Rockett described Nooner as big talker who wanted to seem like a violent criminal, but who did not actually shoot Stobaugh.

Antonia Kennedy testified that her original statement to police and her trial testimony were false and that she had been telling the truth when speaking with the defense investigator prior to Nooner's trial. She made the same assertion in a declaration dated August 21, 2007, claiming to have testified falsely at the trial. In addition, she claimed that Rockett had convinced her to lay blame for Stobaugh's murder on Nooner. She, like Rockett, however, continued to maintain that Nooner bragged about the killing. Contrary to Rockett's testimony, Antonia Kennedy testified that Rockett admitted to her the morning after the murder that he (Rockett) had killed Stobaugh. Also contrary to Rockett's testimony, Antonia Kennedy stated that she had been sexually involved with Rockett.

Nooner's claim of prosecutorial misconduct alleged prosecutors knowingly allowed Antonia Kennedy to testify falsely and failed to disclose the fact that police improperly coerced her into making her initial statement inculpating Nooner. Antonia Kennedy responded to questioning by the court at the evidentiary hearing, however, and stated that no police officers asked her to make false statements or lie

regarding the identity of the killer. According to Antonia Kennedy, officers who questioned her did not know whether Rockett or Nooner had been the shooter and did not direct her to place the blame on either particular suspect.

During the second evidentiary hearing, the court received testimony from Drs. Hartley and Russ. Over repeated objections from Nooner's counsel, the district court extended the hearing until approximately 10:00 p.m. Both experts had submitted reports, with Dr. Hartley's report setting forth his methodology and conclusions, and Dr. Russ's report challenging Dr. Hartley. Nooner cross examined Dr. Russ, challenging his credentials and exposing the inconsistencies that had led to Nooner's motion for discovery and the motion to exclude Dr. Russ's testimony entirely.

In his report and in his testimony, Dr. Hartley described his general methodology for image analysis and discussed specifically his assumptions and corrections made in Nooner's case. In general terms, Dr. Hartley's method of image analysis uses parallel lines within the image to project and calculate an off-image convergence point. The effect relied upon is similar to the apparent convergence of parallel rails of a railroad track at a distant horizon. Using distances determined through the projection of this convergence point and using a purportedly known height within an image (or using the purportedly known height of the camera), Dr. Hartley draws conclusions based upon the relative heights of other objects in the image.

We need not discuss in detail the geometric relationships, proofs, and calculations involved, nor the theoretical viability of Dr. Hartley's techniques in general. Dr. Russ and the state did not challenge the general theoretical underpinnings of Dr. Hartley's method. In other words, given a hypothetical case involving a clear image of a stationary object, the ability to clearly locate the top and bottom of an object in an image, undisputed inputs, and undisputed assumptions, the state and Nooner agree that Dr. Hartley's theoretical approach could be suitable for

-11-

some applications and some levels of proof in idealized situations. Accordingly, we focus our factual recitation upon the areas of disagreement in order to assess the reliability of Dr. Hartley's opinion in this case.

Ultimately, Dr. Hartley testified that he believed the height of the second man in the image to be 66.1 inches, with a possible error of +/- 1.1 inches. Dr. Hartley testified that he started with a poor quality non-digital tape of the laundromat. He then digitized the six most potentially useful images and used a combination of manual and automated steps to locate and approximate straight lines within the image. He also used a manual method to locate and approximate a point on the floor directly beneath the man's head representing a point between where the man's two feet touched the floor. He also testified that, after calculating a height using his geometric projection methods, he came up with a rough measurement of 67.6 inches +/- 0.5 inches (allowing for potential error in extracting measurements from the image and due to the fact that a person stands taller when standing perfectly erect than when walking mid-stride with legs angled away from vertical as the second man in the image appeared to be positioned). Regarding this 67.6 inches +/- 0.5 inch figure, which incorporated an estimated adjustment for stride (the range of 67.1–68.1 inches before consideration of other adjustments), Dr. Hartley stated that he was 75–80% confident in his result.

He then arrived at his overall adjusted measurement of height by making adjustments based on the fact that the man in the image was wearing shoes and wearing a hat. Regarding shoes, Dr. Hartley stated that he could not tell what type of shoes the man in the image was wearing, but that he assumed shoes would add between 0.90 and 1.25 inches depending on type, and applied an adjustment of 1.1 inches for shoes. Dr. Hartley's report stated that he arrived at this figure via simple experiments. In his testimony, he admitted that his source for these estimates was a simple examination of his own height when wearing two different pairs of his own shoes. Regarding an adjustment for the hat, Dr. Hartley described no source for his

estimate. Regarding the adjustment for stride as embodied in the initial figure, Dr. Hartley described walking along a wall "with a thing attached to [his] head" to determine an average height reduction caused by a person's legs being in stride rather than together and vertical. He also described references to this height-impacting effect of walking (in contrast with standing erect with legs straight) in the literature. Dr. Hartley then added these adjustments together, subtracted them from the height determined through his geometric projection method, and concluded, with "99.1 %" confidence, that Nooner could not be the shooter, stating that the actual height of the man in the image was 66.1 inches +/- 1.1 inches (65–67.2 inches).

Finally, Dr. Hartley stated that, prior to his analysis, Nooner's counsel had not provided him with the actual heights of the relevant people in the case. The record shows that an arrest summary of the Little Rock Police Department lists Nooner's height as 68 inches, and an admission to the Arkansas Department of Corrections lists Nooner's height as 69 inches and his weight as 164 pounds. Rockett's arrest report dated March 25, 1993 lists his height as 66 inches and his weight as 115 pounds. Stobaugh's autopsy report stated that he was 70 inches tall and weighed 171 pounds. Further, in the images, Stobaugh, like the second man, was wearing shoes and a hat. The district court noted its impression that Stobaugh and the second man appeared to be approximately the same size.

Dr. Russ criticized Dr. Hartley's methods on several grounds related to the manual vs. automated treatment of the images and related to the several adjustments described above. In addition, Dr. Russ criticized Dr. Hartley's overall failure to identify another object in the image that could be physically measured (such as the victim or one of the various pieces of laundry equipment) and failure to apply the same analysis to such an object. According to Dr. Russ, such a comparison would help to show how a height derived through Dr. Hartley's methodology as applied to the actual images in this case related to "ground truth."

-13-

Finally, Dr. Russ indicated that it would have been possible at the time of the murder (when it would be known that the camera had not been moved or altered) to place a surveyor's rod at the location where the second man was standing, shoot an image, overlay that image with the image of the man, and directly measure his height. The parties agree that the laundromat was remodeled at some time after the trial eliminating the possibility of locating the exact spot the second man was standing based on landmarks in the image.

Dr. Hartley admitted on cross-examination that a direct-measurement, surveyor's-rod technique as described by Dr. Russ could have been performed at the time of the initial investigation. Dr. Hartley also admitted that such a method would have been more accurate than his own method. Dr. Hartley made this admission, however, late in the evening during the extended hearing. Dr. Hartley provided an affidavit after the hearing in which he acknowledged that the technique using a surveyor's rod could have been employed at the time of the initial investigation. Dr. Hartley's affidavit, however, disowned the admission regarding the relative accuracy of his method and the surveyor's rod method. According to the affidavit, Dr. Hartley attributed his concession regarding the accuracy of the surveyor's-rod, direct-measurement technique to the fact that he was tired and not focusing well during the late-night hearing.

After the hearings, Nooner unsuccessfully sought an expanded evidentiary hearing to address: (1) factual issues surrounding an argument by the state that he had not met the diligence requirement in procuring the testimony from his three witnesses; and (2) a plenary evidentiary hearing regarding innocence. In his request for a plenary hearing, Nooner sought the opportunity to present evidence as to all contested issues in the case, but did not identify with particularity any witnesses or evidence that he sought to present. The district court denied the request for an expanded hearing.

-14-

Next, the district court denied relief on several grounds. First, the court concluded that the video-image analysis was not new evidence. The court noted that the techniques Dr. Hartley applied were developed after the trial but held the actual evidence was the height of the murderer, not the analytical techniques. Because the surveyor-rod method could have been employed pre-trial, the court concluded, "Before the remodeling and replacement of the objects in the laundromat, Dr. Hartley's sophisticated methods of estimating the height of the murderer in the surveillance video were not necessary. That they are necessary now does not make the height of the murderer newly discovered evidence that could not have been discovered previously through the exercise of due diligence."

The court then held that, even if it were appropriate to consider Dr. Hartley's opinion, it was unreliable and unconvincing and Nooner had failed to show it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt. The court criticized Dr. Hartley's stride adjustment as unscientific. The court also criticized the failure to perform a comparable measurement on another, measurable object in the image as proof of the validity of Dr. Hartley's technique as applied to the images in this case. The district court also noted that it did not believe Dr. Hartley adequately addressed the fact that the second man in the image appeared to be slightly bent at the waist and leaning forward. Further, the court noted simply that Rockett was 66 inches tall and 115 pounds, Nooner was 68–69 inches tall and 165 pounds, and Stobaugh was 70 inches tall and 171 pounds. The court also noted that Stobaugh and the murderer appeared to be approximately the same size. Finally, the court emphasized that other witnesses identified Nooner by his clothing not merely by his height or appearance, and that the height evidence did not undermine these other identifications.

Regarding Antonia Kennedy and Rockett, the court noted inconsistencies between their respective statements and internal inconsistencies in Rockett's declarations and testimony, as quoted above. In addition, the court noted apparent

inconsistencies between the statements and events observed in the video images and Rockett's statement. For example, the court noted that Rockett admitted he was left handed whereas the shooter appeared to be right handed. Also, Rockett claimed to be the driver and stated he never let Nooner drive, whereas the images appear to show headlights moving outside the laundromat while the murderer is in the laundromat, as though the car is being repositioned to leave. Further, the court emphasized that both Antonia Kennedy and Rockett still maintain that Nooner confessed to being the shooter, although both claim now that they believe Nooner's confessions to them were false.

Finally, the court addressed the general skepticism with which the Supreme Court and Eighth Circuit have treated recantation testimony, the general lack of risk to Rockett in recanting (he has already been sentenced to life imprisonment for his participation in Stobaugh's murder), and the fact that the evidence Nooner relies upon "to show his innocence contradicts rather than supplements the evidence upon which he relied at trial" because all purportedly new evidence would place Nooner in the car, whereas at trial he claimed to be home in bed.

Even though the court rejected the attempted showing of actual innocence, the court held in the alternative that most of the purported Brady evidence Nooner relied upon for his substantive claim was neither new nor previously unavailable. One possible exception was the purported coercing of a false statement from Antonia Kennedy by police investigators. As to this point, the court stated that Antonia Kennedy had answered direct questions from the court at the evidentiary hearing disavowing any claim to have been instructed or asked by police to testify falsely.

Nooner then filed a motion to reconsider. The court rejected the motion, issuing a detailed order expanding on its analysis. In the motion, Nooner asserted it was not known whether the camera Dr. Hartley used for a reference height was the same or different than the camera in place at the time of the murder. The court stated

-16-

that this assertion undercut Nooner's position, because Dr. Hartley relied upon the measured height of the camera as his only reference point. The court concluded:

> At one point Nooner criticizes the Court's observations regarding the relative size of the gunman as compared to Scot Stobaugh as "unscientific and unreliable," but the Court was simply describing how reasonable jurors would likely see the evidence. . . . Nooner would have the Court say that reasonable jurors would be more likely to believe Dr. Hartley's calculations than what they can see with their own eyes, but jurors are not obliged to, and are not likely to, disregard what they can see in deference to an esoteric mathematical and technological analysis the accuracy of which cannot be verified. Although Nooner asserts that the Court is "flatly incorrect" in saying that it is impossible to say the extent to which Dr. Hartley's calculations correspond to ground truth, the Court does not agree. Because he did not calculate the height of any object in the videotape the height of which could be independently confirmed, it is impossible to know the extent to which Dr. Hartley's calculations correspond to ground truth.

## II. Discussion

### A. Successive Habeas Standards

Nooner asserts a stand-alone claim of actual innocence in addition to asserting actual innocence as a "gateway" issue to permit his presentation of a <u>Brady</u> claim in this successive petition.[5] For gateway purposes, to enable presentation of a claim

---

[5]The Supreme Court has suggested that a stand-alone claim of actual innocence may be cognizable. <u>See</u> <u>House v. Bell</u>, 547 U.S. 518, 554 (2006); <u>Herrera</u>, 506 U.S. at 417. The Court has not articulated a standard of proof that might apply to such a claim, but some justices have stated that any such standard would be more stringent than that required to prove actual innocence for gateway purposes. <u>See, e.g.</u>, <u>Herrera</u>, 506 U.S. at 426 (O'Connor, J., concurring) (explaining that an "extraordinarily high" standard of review would apply to any such claim because the conviction under attack

alleging a constitutional violation, a state prisoner seeking relief in a successive federal habeas proceeding must show that:

> (i) the factual predicate for the claim could not have been discovered previously through the exercise of due diligence; and

> (ii) the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2244(b)(2)(B). The phrase "evidence as a whole," as used in § 2244(b)(2)(B)(ii), refers to the entirety of the trial evidence as well as new evidence offered in the collateral proceedings. Regarding evidence offered in the collateral proceedings, the petitioner must "come forward not only with new reliable evidence which was not presented at trial, but . . . come forward with new reliable evidence which was not available at trial through the exercise of due diligence." Kidd v. Norman, 651 F.3d 947, 953 (8th Cir. 2011).

When assessing the likely impact of this overall body of evidence upon reasonable jurors, the court itself does not view the evidence through a personal and

---

presumably would have resulted from an underlying state trial free of any prejudicial constitutional error, unlike gateway claims of actual innocence where the prisoner asserts the underlying conviction is tainted by error of constitutional magnitude); Dansby v. Norris, 682 F.3d 711, 716 (8th Cir. 2012) (stating that the standard applicable to a stand-alone claim of actual innocence, if cognizable at all, would be extraordinarily high and higher than the standard for a gateway assertion of innocence). In any event, there is no authority suggesting the standard would be more lenient than that applied to gateway claims of actual innocence. Accordingly, where it is determined that a prisoner fails to make an adequate showing of actual innocence for gateway purposes, it is unnecessary to address separately the possibility of a stand-alone claim of actual innocence.

-18-

subjective lens. Rather, the court must conduct an objective analysis of how hypothetical, rational jurors likely would view the evidence. See Schlup v. Delo, 513 U.S. 298, 329 (1995) ("It is not the district court's independent judgment as to whether reasonable doubt exists that the standard addresses; rather the standard requires the district court to make a probabilistic determination about what reasonable, properly instructed jurors would do."). Here, the district court determined that the purportedly new evidence was unreliable and that no reasonable juror would fail to find Nooner guilty beyond a reasonable doubt based upon the totality of the evidence.

The parties disagree as to whether our entire review is de novo or whether the district court's underlying reliability assessment is a factual determination that we must review with deference. In similar contexts, we have held that determination of the reliability of purportedly new evidence is "a credibility determination which is entitled to great deference." Amrine v. Bowersox, 238 F.3d 1023, 1029 (8th Cir. 2001) (deferring to a district court's credibility assessment regarding the reliability of a recanting witness's new testimony); see also Storey v. Roper, 603 F.3d 507, 524 (8th Cir. 2010) (applying clear error standard to review district court's assessment of new evidence); Wooten v. Norris, 578 F.3d 767, 782 (8th Cir. 2009) (reviewing for clear error a district court's factual determination regarding the credibility of evidence of actual innocence). Accordingly, we review the district court's credibility determinations for clear error, and we review *de novo* its overall assessment of how hypothetical, rational jurors would view the entire record as to the issue of actual innocence. See Kidd, 651 F.3d at 952 n.5 (stating in the context of an actual innocence analysis that a district court's "credibility determination is virtually unreviewable on appeal"); Raymond v. Weber, 552 F.3d 680, 683 (8th Cir. 2009) ("We review a district court's denial of habeas relief for clear error in respect to findings of fact, and de novo for questions of law or for mixed questions of law and fact.").

B.  Actual Innocence—New Evidence and Adequacy of Nooner's Showing

Nooner presents several interrelated arguments relevant to the threshold showing of actual innocence and to the district court's various procedural rulings.  For the reasons stated below, we find clear error neither in the district court's determination that the expert testimony is not "new" evidence nor in its reliability and credibility assessments.  We also find no error in the district court's predictive analysis of how actual jurors would view the totality of the evidence regarding actual innocence.  In addition, even assuming error occurred as to one or more of the procedural issues that Nooner raises, we find no prejudice that might undermine the district court's credibility assessments or actual innocence determination.

i.  New Evidence

Dr. Hartley's opinion of the second man's height cannot be deemed new evidence.  See Kidd, 651 F.3d at 953 (holding that "new evidence" is evidence that could not have been offered at trial through the exercise of due diligence). Although Dr. Hartley contests the accuracy that could have been attained with the surveyor's-rod, direct-measurement method described above, he admits such a technique could have been employed prior to trial.  In our view, minor potential differences in the relative accuracies of Dr. Hartley's current method and the simple method using a surveyor's rod are not material to the issue of whether the present height evidence is "new evidence" as described in Kidd.  See McDonald v. Bowersox, 125 F.3d 1183, 1186 (8th Cir. 1997) (per curiam) (rejecting a petitioner's argument that the improved ability to diagnose and treat mental afflictions in the ten years since a trial made a psychiatric opinion proffered post-trial "new evidence").

Neither before Nooner's 1993 trial, before his initial petitions for collateral relief, nor prior to 2007, did Nooner proffer evidence attempting to distinguish his own height from the height of the second man in the video images.  At all times,

-20-

however, there existed the *capability* through simple methods to ascertain the height of the second man in the image.[6]  For whatever reason, defense counsel elected not do so.  Accordingly, the present availability of a different measuring technique does not make an opinion based on the new technique "new evidence."  See id.; Noel v. Norris, 322 F.3d 500, 503 (8th Cir. 2003) (rejecting an argument that brain-scan evidence based on a technique developed after sentencing could serve as "newly discovered evidence" in support of a claim for initial habeas relief).

We note also that there is nothing to suggest Nooner's failure to present some form of height evidence at trial is attributable to anything other than trial strategy or a lack of diligence.  Even if we were to view Rockett's present confession as true, then Nooner would have to have known at the time of trial that Rockett was the shooter—Rockett placed Nooner outside the laundromat in the car.  Nooner, however, chose neither to stand mute nor rely upon the purported knowledge that Rockett was the shooter (and use height evidence to prove Rockett rather than Nooner was the second man in the video).  Instead, Nooner elected to present testimony placing himself at home in bed at the time of the murder.  Previously available evidence is not new simply because a defendant elects to change strategies long after the conclusion of his state trial.  See Wainwright v. Sykes, 433 U.S. 72, 90 (1977) ("[T]he state trial on the merits [should be] the 'main event,' so to speak, rather than a 'tryout on the road' for what will later be the determinative federal habeas hearing.").

---

[6]We do not purport to address a situation where the newly proffered scientific evidence truly represents exonerating evidence that could not have been obtained at trial.  For example, we do not suggest DNA analyses cannot be deemed new evidence if the trial occurred before there were any scientific capabilities to accurately identify the source of a biological sample using DNA.  We hold merely that where the capability of obtaining data from evidence existed at trial, and the defendant elected not to utilize that capability, data derived from a subsequently developed technique generally should not be deemed "new."

### ii. Credibility Assessment

We also hold that even if Antonia Kennedy's recantation, Rockett's confession, and Dr. Hartley's analysis could be deemed new evidence, the district court did not clearly err in its credibility assessments. See Amrine, 238 F.3d at 1028 (8th Cir. 2001) (affirming a denial of habeas relief where "the only new evidence proffered . . . was unreliable, [and] the court concluded that no further Schlup analysis was necessary."). The district court identified internal inconsistencies in Rockett's handwritten and typed declarations and in Rockett's testimony from the evidentiary hearing, as well as inconsistencies between Antonia Kennedy's recantation and Rockett's confession. For example, Rockett denied in one written statement that he had seen Stobaugh's checkbook or had it in a car, but stated in his other written statement that he possessed the checkbook and gave it to Antonia Kennedy. Rockett claimed with great specificity to have formulated his plan to pin Stobaugh's murder on Nooner while in police custody on a particular date and in response to overhearing Nooner talking to police. Rockett, however, first inculpated Nooner prior to the day that Nooner spoke to police and could have been overheard by Rockett. Further, Antonia Kennedy stated that Rockett admitted to killing Stobaugh the morning after the murder and that Rockett told her to place the blame on Nooner. Rockett, however, denied telling Antonia Kennedy the day after the murder that he, rather than Nooner, had shot Stobaugh. As a result, it is not clear if Nooner now asserts Antonia Kennedy and Rockett created the purported plot to falsely blame Nooner the morning after the killing or sometime after Rockett was in police custody.

Additional inconsistencies bear on the witnesses' credibility and motivations for recanting or confessing. Rockett denies having been sexually involved with Antonia Kennedy, but she claims to have been sexually involved with Rockett prior to Stobaugh's murder. Further, Antonia Kennedy's history of making contradictory statements in this case includes not only her versions of the facts as delivered to police, the defense investigator, and the jury, but also her allegation of police

-22-

misconduct. She signed a declaration asserting that police told her to lie and blame Nooner, but she told the district court during the evidentiary hearing that police did not tell her to lie or name Nooner as the shooter. The district court emphasized that Rockett had nothing to lose by confessing because he was already serving a life sentence for his participation in Stobaugh's murder. Finally, both Antonia Kennedy and Rockett maintain that Nooner claimed to be the shooter the morning after the murder, even though they assert that Rocket rather than Nooner actually was the shooter.

Nooner challenges the district court's credibility assessment in two ways. First, he argues we owe no deference to the district court's credibility determinations because they are not separate factual determinations, but rather, are merely part of the overall actual innocence analysis that we should review de novo. Second, he attempts to minimize the impact of the inconsistencies and argues he was improperly denied discovery and an expanded hearing as necessary to fully analyze the evidence of actual innocence.

As stated above, circuit precedent requires that we treat the district court's credibility/reliability assessment as a factual finding, and—as in most similar circumstances—defer to the superior fact-finding ability of the district court who possessed more than a cold record and who took live testimony from the witnesses and observed their demeanor at the evidentiary hearing. Kidd, 651 F.3d at 952 n.5.

Regarding Nooner's factual arguments, he fails to reconcile the listed inconsistencies. Rockett and Antonia Kennedy described Nooner as a "big talker" who wanted to be viewed as a killer and who falsely claimed Rockett's exploits as his own. Nooner argues that Antonia Kennedy's selective recantation and her continued adherence to the claim that Nooner made a morning-after confession is consistent with the view that Nooner was merely a "big talker." This argument is tenuous at best and simply fails to convince that the district court committed clear error, especially

-23-

in light of the skeptical manner in which courts are to treat long-after-the-fact recantation testimony. See United States v. Holmes, 421 F.3d 683, 688 (8th Cir. 2005) ("[W]e view [recanted testimony] and its potential evidentiary value at a new trial with suspicion."); United States v. Rouse, 410 F.3d 1005, 1009 (8th Cir. 2005) ("The stability and finality of verdicts would be greatly disturbed if courts were too ready to entertain testimony from witnesses who have changed their minds, or who claim to have lied at the trial." (citation and internal quotation marks omitted)).

Nooner also fails to demonstrate clear error in the district court's assessment of Dr. Hartley's reliability. Dr. Hartley's methods were, in the abstract and applied to hypothetical, clear images, unchallenged. Here, however, Dr. Hartley took several steps in reaching his conclusions that are easily understood by lay persons and lack scientific rigor. As noted, he manually identified a location on the image he believed to represent a point on the floor beneath the second man's head to use as a bottom point for measurements. He empirically assessed the impact of shoes on height by using a sample size of two pairs of his own shoes and estimating how much height shoes (generically defined) might add to the man in the image. He assessed a height reduction due to stride by placing an unidentified "thing" on his own head and tracing his height on a wall was he walked. And, he simply created what he believed to be a conservative estimate of a height that might be added due to a hat.

Adding to these potential sources of unreliability are the facts that (1) even before making the shoe and hat adjustment Dr. Hartley was only 75–80% confident in his result; (2) the height evidence in no manner explained why the two men in the image appeared to be roughly the same size even though Rocket was fifty-five pounds lighter than Stobaugh and forty-nine pounds lighter than Nooner, whereas Nooner and Stobaugh were roughly the same height and weight; (3) Dr. Hartley performed no control measurement upon Stobaugh or any object in the image to illustrate how his method actually performed when applied to the particular, poor-quality image obtained from the videotape in this case; and (4) Dr. Hartley's conclusion was

inconsistent with the other identification testimony which relied upon clothing rather than height.

Finally, the district court stated that Dr. Hartley had not sufficiently taken into account the fact that the second man in the image appeared to be bending at the waist. Nooner argues Dr. Hartley adequately addressed this issue through a discussion of "foreshortening," a visual effect caused when an image is taken from above. According to Dr. Hartley, the foreshortening effect causes the top and bottom of an object in an image to appear with slightly different scales such that the object appears to be leaning towards the camera. The district court did not clearly err in this regard because, whereas foreshortening may explain why an object appears to be leaning, it does not explain why a person in an image would appear to be bending at the waist. This point is particularly strong in the present case where the critical image shows the second man from a partial side view in which he appears to be bending slightly at the waist in a direction perpendicular to the line of sight of the camera. This visual image is simply inconsistent with Nooner's explanation of foreshortening.

iii. Actual Innocence

Having determined that the Nooner's evidence is not reliable and Dr. Hartley's opinion is not new, it is unnecessary to conduct a further Schlup analysis. Amrine, 238 F.3d at 1028. In the alternative, however, even considering the proffered evidence in the context of the trial evidence, the evidence was "not particularly convincing and easily marginalized." Storey, 603 F.3d at 524 (internal quotation marks omitted) (reviewing a district court's assessment of purportedly "new evidence" and holding the petitioner failed to demonstrate actual innocence). Here, the jury that convicted Nooner actually knew Antonia Kennedy had given two inconsistent statements prior to trial. Hypothetical, rational jurors, then, would have to reconcile the fact that she previously was confronted with her conflicting statements and declared the statement inculpating Nooner to be the truth whereas her long-after-the-

-25-

fact reversal and partial recantation disclaimed the truth of that statement. Such a jury would also be required to reconcile Nooner's evidence as presented at trial—in which he claimed to be home in bed at the time of the shooting—with his morning-after confession to Antonia Kennedy, and with Rockett's only-partially-consistent confession (all of which placed him at the scene). Further, even the evidence Nooner chose to present at trial was internally inconsistent in that his step-father testified Terri Kennedy and Nooner's son were not at home with Nooner the night of the murder, whereas Terri Kennedy testified that the child was with Nooner on that night. Finally, nothing in the evidence Nooner asserts as new undermines the testimony of Jazmaar Kennedy or Johnny Martin who testified that they had seen Nooner wearing the same clothes as the second man in the image prior to the murder. Similarly, the purportedly new evidence does not undermine the testimony of Isaac Warren who stated that he saw Nooner with a 0.22-caliber Ruger pistol prior to the murder, but not after the murder.

Nooner does not address these factual issues head-on, arguing instead that he was denied the opportunity to present additional evidence needed to prove his innocence, that the district court erred in denying discovery and in admitting and relying upon the opinion of Dr. Russ, and that the district court misconstrued the actual innocence standard. For the reasons explained below, these arguments fail to show that "no reasonable factfinder would have found [Nooner] guilty of the underlying offense." 28 U.S.C. § 2244(b)(2)(B)(ii).

Regarding the opportunity to present additional evidence, Nooner argues he should have been granted a plenary evidentiary hearing. We review the district court's decision to grant, deny, or limit the scope of an evidentiary hearing during habeas proceedings only for abuse of discretion. See Schriro v. Landrigan, 550 U.S. 465, 480–81 (2007) (holding that a district court did not abuse its discretion in refusing an evidentiary hearing on a habeas claim); Schlup, 513 U.S. at 332 (remanding and noting "the District Court's ability to take testimony from the few key

witnesses *if it deems that course advisable*" (emphasis added)); <u>Wadlington v. United States</u>, 428 F.3d 779, 784 n.2 (8th Cir. 2005) ("[T]he court's failure to hold an evidentiary hearing to evaluate Hood's new testimony was not an abuse of discretion. An evidentiary hearing is not necessary where, as in this case, the district judge observed the demeanor and credibility of the witness at trial or is otherwise thoroughly familiar with the record of the case." (internal citation omitted)). On appeal Nooner argues specifically that he should have been permitted to call Jazmaar Kennedy and Johnny Martin to challenge their trial testimony in light of the other evidence he presented at the hearing.

In contrast to his specific argument to our court, Nooner asked the district court in general terms to present evidence or arguments beyond the expert opinion of Dr. Hartley and the recantations of Antonia Kennedy and Rockett. Nooner argued generally that all earlier identification evidence based on the video was unreliable in light of Dr. Hartley's new opinion, the recantation, and the confession. In attacking the reliability of earlier video-identification testimony, however, Nooner named several witnesses *other than* Jazmaar Kennedy and Johnny Martin. Nooner did not seek to present testimony specifically from Jazmaar Kennedy or Johnny Martin, nor did he allege that either witness had recanted.

Even if he had specifically sought to introduce testimony from Jazmaar Kennedy or Johnny Martin, though, these witnesses identified Nooner in the surveillance video based on the clothing he was wearing, and it is difficult to appreciate how Dr. Hartley's discussion of height would impact identifications related to clothing. In short, Nooner made neither a specific request nor a specific proffer to show what he wanted to place into evidence.[7]

_____

[7]Further, at oral argument to our court, counsel stated that no preparations had been made to present such witnesses. Accordingly, it is not the case that Jazmaar Kennedy and Johnny Martin were present to testify or had been subpoenaed.

Given the vague nature of Nooner's request, the district court did not abuse its discretion in holding a hearing on only the three items the district court properly understood to be most pertinent to Nooner's claims: the expert witness testimony and the veracity of the two recantations. Schlup does not hold habeas prisoners have unlimited rights to plenary hearings. Instead, the Court stated lower courts may hear evidence from "key witnesses." See Schlup, 513 U.S. at 332 (noting the "fact-intensive nature of the inquiry" and the "District Court's ability to take testimony from the few key witnesses").

To the extent Nooner argues procedural error surrounding Dr. Russ infected the factual analysis, his arguments are without merit. As to both the motion for discovery and the motion to exclude, any error that may have occurred caused no prejudice to Nooner and provides no basis to disturb the district court's judgment. See Barrett v. Rhodia, Inc., 606 F.3d 975, 980 (8th Cir. 2010) ("We will not reverse a district court's ruling on the admissibility of expert testimony absent a clear and prejudicial abuse of discretion.") (internal quotation marks omitted); Sheets v. Butera, 389 F.3d 772, 780 (8th Cir. 2004) ("'Our review of questions concerning discovery matters is very deferential. . . . We will not reverse such a determination absent a gross abuse of discretion resulting in fundamental unfairness in the trial of the case.'") (quoting SDI Operating P'ship v. Neuwirth, 973 F.2d 652, 655 (8th Cir. 1992)). Prejudice stemming from the admission of Dr. Russ as an expert necessarily would have to present itself through the court's reliance upon Dr. Russ's technical expertise, i.e. reliance upon his opinions *as an expert*. Here, however, to the extent the district court relied upon Dr. Russ, it did so only as to matters well within the understanding of lay persons.

We have held that "[w]here the subject matter is within the knowledge or experience of lay people, expert testimony is superfluous." United States v. Coutentos, 651 F.3d 809, 821 (8th Cir. 2011) (internal quotation marks omitted). We have also held that, as to issues of medical causation or deliberate indifference to

medical needs, expert testimony is unnecessary where the medical condition or issue of causation "would have been obvious to a layman." Roberson v. Bradshaw, 198 F.3d 645, 648 (8th Cir. 1999). We believe it follows naturally from these cases that no prejudice can be shown based on the improper admission of an expert or the denial of discovery regarding an expert where a court's only reliance upon the expert goes to matters on which the expert testimony was, in effect, superfluous.

The district court identified the failure of Dr. Hartley to conduct a comparative measurement of some other person or object in the image to prove how his method as applied to the image corresponded to "ground truth." Dr. Russ leveled this same criticism at Dr. Hartley. We do not believe criticism of a measurement technique based on the failure to perform a control measurement is the type of criticism that lies beyond the understanding of lay persons. Similarly we do not believe criticism of Dr. Hartley's ad hoc methods of determining adjustments for various methods lie outside the realm of a lay person's understanding.

Nooner also argues the district court misconstrued the standard of Schlup v. Delo and 28 U.S.C. § 2244(b)(2)(B) by failing to view the evidence through the eyes of hypothetical, rational jurors. Nooner argues the district court did not pose the question, "what would reasonable jurors do," but rather, assumed jurors to be flawed human beings skeptical of science and technology who would never trust Dr. Hartley's testimony over what they could see with their own eyes. Nooner's argument appears to be wholly dependent upon the following passage from the district court's written order denying a motion to alter or amend the initial judgment:

> Nooner would have the court say that reasonable jurors would be more likely to believe Dr. Hartley's calculations than what they can see with their own eyes, but jurors are not obliged to, and are not likely to, disregard what they can see in deference to an esoteric mathematical and technological analysis the accuracy of which cannot be verified. Although Nooner asserts that the Court is "flatly incorrect" in saying

-29-

that it is impossible to say the extent to which Dr. Hartley's calculations correspond to ground truth, the Court does not agree. Because he did not calculate the height of any object in the videotape the height of which could be independently confirmed, it is impossible to know the extent to which Dr. Hartley's calculations correspond to ground truth.

Nooner seizes upon the phrase "esoteric mathematical and technological analysis." His emphasis, however, is misplaced. It seems clear the court was merely describing how rational jurors would view the evidence the court had already determined to be unreliable. In fact, the district court incorporated into the same passage its criticism of Dr. Hartley based on his failure to conduct a control measurement of some other person or object in the image.

Nooner's argument that the district court applied the wrong standard, then, is really an argument that the district court should have been *compelled* to find Dr. Hartley's opinions and conclusions (and the selectively recanted testimony) sufficient to impart reasonable doubt in the minds of reasonable jurors. In this regard, however, Nooner misconstrues the posture of the case. The evidence was neither proffered in an effort to obtain an evidentiary hearing nor was it presented as a preliminary manner that might require a court to view it in a light most favorable to Nooner. Instead, Dr. Hartley's analysis was introduced at the evidentiary hearing to be assessed by the court for reliability and for its likely impact upon potential jurors. That Dr. Hartley's opinion may have been admissible does not mean the finder of fact was required to rely upon it. The district court did not depart from the proper predictive analysis merely because it determined Dr. Hartley's opinion was unconvincing in light of other evidence.

Finally, Nooner argues that the extension of the second evidentiary hearing into the night was structural error that infected the entire proceedings or, at a minimum, was prejudicial in that Dr. Hartley conceded the prior availability and accuracy of a simpler height-measurement technique. In arguing that the error was structural and

requires no showing of prejudice, Nooner characterizes potential performance deficiencies that might arise due to exhaustion or confusion of counsel as the complete denial of counsel. He points to actual conflict of interest cases and the complete denial of counsel as structural error that obviates any need to show prejudice. See, e.g., Holloway v. Arkansas, 435 U.S. 475, 490–91 (1978) (deeming an actual conflict of interest by counsel as structural error). We find no authority to support his attempted analogy. The list of errors deemed structural is not a list we expand lightly, and we decline the invitation to label any error by the district court in exercising its discretion regarding management of the evidentiary hearing in this case as structural. See United States v. Jones, 662 F.3d 1018, 1028 (8th Cir. 2011) ("These extreme errors have been recognized in a very limited set of circumstances.").

Regarding Dr. Hartley's concession, we find no prejudice. Even in his post-hearing affidavit, Dr. Hartley did not disown his statement that the surveyor-rod method for measuring the height of the second man in the image could have been performed at the time of the initial investigation. Dr. Hartley retracted his statement that the simpler method would have been more accurate. The minor differences in the relative accuracy of the two methods, however, is not outcome determinative in this case. Accordingly, we find no prejudice.

Because the district court did not err in its credibility assessments, and because Dr. Hartley's opinion is not "new" evidence, Nooner cannot meet the threshold requirements of § 2244(b)(2)(B). In the alternative, we agree with the district court's analysis of the evidence as a whole and the determination that Nooner failed to prove it more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt. Nooner's arguments that these determinations were infected with structural error or prejudice are without merit.

-31-

We affirm the judgment of the district court.[8]

_____

<hr>

[8]The pending motion to expand the record regarding extension of the second evidentiary hearing is denied as moot given our resolution of this issue. The pending motion for recusal of all circuit judges also is denied.