# United States Court of Appeals
## For the Eighth Circuit

_____

No. 18-3581

_____

Thomas Daniel Rhodes

*Petitioner - Appellant*

v.

Michelle Smith, Warden

*Respondent - Appellee*

_____

Appeal from United States District Court
for the District of Minnesota

_____

Submitted: December 10, 2019
Filed: February 24, 2020

_____

Before SMITH, Chief Judge, LOKEN and GRASZ, Circuit Judges.

_____

GRASZ, Circuit Judge.

Thomas Rhodes appeals the district court's[1] denial of his third successive federal habeas corpus petition from his state law murder conviction. Despite

[1]The Honorable Joan N. Ericksen, United States District Judge for the District of Minnesota.

Rhodes's claims of new scientific evidence proving innocence and entitlement to an evidentiary hearing, the district court found it lacked jurisdiction to hear his petition because he failed to establish by clear and convincing evidence it was "more likely than not that no reasonable jury would have found [him] guilty beyond a reasonable doubt." 28 U.S.C. § 2244(b)(4). Due to the Antiterrorism and Effective Death Penalty Act's ("AEDPA") steep procedural hurdles for second or successive federal habeas petitions, we agree.

## I. Background

Rhodes was convicted of the first-degree and second-degree murder of his wife, Jane Rhodes, after she drowned while the two were boating on Green Lake in August 1996. Around 11:30 p.m. Jane and Rhodes were in their speedboat on Green Lake and at some point around midnight Jane went overboard. Rhodes contends he jumped into the water to search for Jane and drove around in the boat looking before returning to their hotel to call the police. Rhodes then took the police to the place on the lake where he alleged Jane fell out, but the police searched to no avail. About thirteen hours later, some fishermen found Jane's body floating on the lake's surface nine-tenths of a mile away from where Rhodes took the police officers.

At trial, the State argued Rhodes forced his wife overboard with a blow to the neck, struck her multiple times with the hull of the boat, and lied to the police about the location of the drowning. Among other witnesses, the State presented Dr. Michael McGee as their medical expert. McGee testified about Jane's injuries, including the severe bruising to the upper face along the hairline, at least one black eye, and internal bleeding underneath the scalp. McGee testified these facial injuries could be consistent with multiple strikes from the boat's hull. He also testified regarding a laceration near her mouth and a pair of injuries to her forearms. Significant to this appeal, McGee further testified about the internal hemorrhaging in Jane's neck. Specifically, he discussed how Jane's autopsy showed "a series of

-2-

soft tissue hemorrhages inside her neck region" but showed no external injury or bruising. In McGee's opinion, Jane "received some type of trauma to the outer surface of the skin in the neck area . . ., with enough force to cause breakage of the blood vessels . . . and cause the hemorrhage to occur for a period of time prior to the subject's death." McGee further acknowledged it was *possible* the external injury could have been caused by a hand striking the neck in a "V position."

In his current petition on appeal, Rhodes argues new peer-reviewed medical literature elucidates that internal neck hemorrhages may be consistent with injuries sustained in the drowning process, and that such injuries were not necessarily inflicted before drowning.

Another important topic at trial was the water temperature of Green Lake at the time of Jane's drowning. At trial, the State argued Rhodes was not truthful in disclosing the location of the drowning to the police because in the location Rhodes identified, the water was forty feet deep and Jane's body resurfaced only thirteen hours after the drowning occurred. An expert witness, Captain William Chandler, testified that once an adult person drowns and submerges, the body will go straight down. In the absence of a current or other obstruction, the body will not travel after sinking but will eventually refloat due to the decomposition of the body by bacteria. The hotter the water, the quicker the decomposition and resurfacing time. Chandler testified that "[i]n Minnesota lakes, upper Midwest, they are all fresh water lakes that are over 30 feet deep, you've got some basic levels of water in all of them, but starting about 30 feet on down, the bottom temperature of any Minnesota lake year round is about 39 degrees, so it's essentially like a refrigerator." Chandler concluded that he believed a body drowned in the location Rhodes identified would have taken "several weeks" to refloat. Even Dale Morry, Rhodes's expert, testified that although water temperature varies from lake to lake depending on the depth, size, and surface temperature, "as a 'rule of thumb' a person who drowned in 40 feet of water would resurface in five to eight days."

For purposes of this habeas action, Rhodes alleges Chandler's testimony was false because a survey completed by the Minnesota Department of Natural Resources ("DNR") in 2006 indicated the temperature of Green Lake in August of 1996 at a depth of forty feet was 68.9 degrees.

At trial there was also evidence presented of a "six-month nonsexual relationship . . . Rhodes [had] about one year before Jane's death," a visit to a divorce attorney, his recent purchases of life insurance on Jane, increasing family debt during 1996, and several witnesses from the night of the incident offering contradicting accounts of what they saw or heard on Green Lake that evening.

Since Rhodes's conviction in 1998, he has filed four state post-conviction petitions as well as two previous federal habeas corpus petitions. In his most recent state petition, Rhodes argued to the Minnesota Supreme Court that the new scientific literature on neck hemorrhages and evidence of Green Lake's temperature merited post-conviction relief. With two justices dissenting, the Minnesota Supreme Court denied the petition, finding that Rhodes failed to establish innocence by clear and convincing evidence because the new scientific literature, at most, established that the "victim's internal neck hemorrhages 'could' have been caused by natural drowning processes," which "does not unequivocally establish that Rhodes did not kill his wife." The Minnesota Supreme Court also found the conviction was "independently supported by nonmedical (i.e., nonscientific) evidence." It further concluded that the new water temperature evidence did not dispute Morry's testimony that it takes bodies at least five days to resurface.

Because the district court issued Rhodes a certificate of appealability for his claims of new evidence and entitlement to an evidentiary hearing, we have jurisdiction to hear this appeal under 28 U.S.C. § 2253(c).

-4-

## II. Analysis

This is a troubling case and one that presents issues that divided the Minnesota Supreme Court. The question before this court, however, is not whether we would find guilt of first-degree murder beyond a reasonable doubt under the evidence now available. Our review is narrowly constrained and includes great deference to what hypothetical, rational jurors could conclude. For a successive habeas petition, we review the district court's factual and credibility determinations for clear error, and "we review *de novo* its overall assessment of how hypothetical, rational jurors would view the entire record as to the issue of actual innocence." *Nooner v. Hobbs*, 689 F.3d 921, 933 (8th Cir. 2012).

Successive habeas corpus petitions filed in state court and brought to federal court under 28 U.S.C. § 2254 are governed by 28 U.S.C. § 2244 and are "tightly constrained by the provisions of AEDPA." *Case v. Hatch*, 731 F.3d 1015, 1026 (10th Cir. 2013). As such, there are two procedural "gates" found in § 2244 that are jurisdictional in nature, and a successive petition must pass through both gates before the merits of a § 2254 petition may be heard. *Id.* at 1027 (citing *Panetti v. Quarterman*, 551 U.S. 930, 942–47 (2007)).

First, a petitioner must seek an order authorizing the district court to consider a successive habeas petition under § 2244(b)(3). Rhodes sought and received permission to file this third federal habeas petition.

Second, the petitioner must satisfy the § 2244(b) requirements. Relevant here is § 2244(b)(2), which provides:

> (2) A claim presented in a second or successive habeas corpus application under section 2254 that was not presented in a prior application shall be dismissed unless –

(B)(i) the factual predicate for the claim could not have been discovered previously through the exercise of due diligence, *and*

(ii) *the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.*

28 U.S.C. § 2244(b)(2) (emphasis added). Only the questions raised by § 2244(b)(2)(B)(ii) are raised on appeal and we must determine whether the district court erred in holding Rhodes failed to submit clear and convincing evidence that but-for an assumed constitutional violation,[2] no reasonable factfinder would have convicted him.

The standard outlined in § 2244(b)(2)(B)(ii) has been described as a "strict form of innocence . . . roughly equivalent to the Supreme Court's definition of innocence or manifest miscarriage of justice in *Sawyer v. Whitley*." *Case*, 731 F.3d at 1031 (internal quotation omitted) (citing *Sawyer v. Whitley*, 505 U.S. 333 (1992)). Assuming, without deciding, Rhodes has met his burden as to a constitutional violation and in all other respects, we must determine whether this new evidence, when added to the "body of evidence produced at trial," clearly and convincingly shows no reasonable factfinder would have found Rhodes guilty of murdering his wife. *Id.* at 1033. We conclude it does not.

---

[2]Rhodes claims "constitutional errors" occurred at his trial based on the new scientific information relating to neck hemorrhages and lake water temperature. Rhodes argues the new evidence "demonstrates his conviction was the product of false testimony, and as a result, violated his federally protected right to due process and under the Confrontation Clause." Like the district court, we assume for purposes of the argument, but do not decide these claims are constitutional violations.

-6-

Rhodes presents two peer-reviewed articles published in 2009 and 2011, which Rhodes claims establish that neck hemorrhaging can occur before death as a person drowning struggles to stay above water.[3] Rhodes contends that these two reports, as well as the opinions of seven different pathologists, indicate McGee's testimony that Jane's neck hemorrhages were caused by some external force before drowning was false. He also contends that without McGee's testimony no reasonable factfinder could convict. We disagree. McGee did not testify drowning-induced neck hemorrhages *never* occur naturally during the drowning process. Instead, he simply opined that the victim "received some type of trauma to the outer surface of the skin in the neck area," and that it was "possible" the injury was caused by a hand in a V position. Even in light of these new studies, a reasonable juror hearing McGee's testimony could still determine external force caused Jane's neck hemorrhages. Further, even if the new scientific evidence were sufficient to fully refute McGee's testimony, it would not be sufficient to establish actual innocence because, as the Minnesota Supreme Court found, "Rhodes's murder conviction is independently supported by nonmedical (i.e., nonscientific) evidence," including "physical and motive evidence, testimony as to Rhodes' conduct, and inconsistencies in Rhodes' statements."

Likewise, the 2006 Minnesota DNR report does not undercut the jury's findings. There is no evidence to support the notion that a body drowned in forty feet of water, regardless of temperature, would resurface in less than even twenty-four hours. Rhodes's own expert testified the minimum "rule of thumb" was five days for resurfacing, regardless of temperature. Thus, even without Chandler's testimony about the water temperature in Minnesota, the jury still would have heard it was extremely unlikely that Jane's body would have resurfaced in thirteen hours if she had

---

[3]Russell T. Alexander & Jeffrey M. Jentzen, *Neck & Scleral Hemorrhage in Drowning*, 56 J. Forensic Sci. 522 (2011); Michael S. Pollanen et al., *Hemorrhagic Lividity of the Neck: Controlled Induction of Postmortem Hypostatic Hemorrhages*, 30 Am. J. Forensic Med. & Pathology 322 (2009).

drowned at a depth of forty feet. Additionally, there was no testimony, beyond the experts asserting drowned bodies generally sink, to establish whether or not Jane's body did sink at all. Therefore, it was possible for a reasonable juror to believe Rhodes lied to the police about the location of Jane's disappearance because, if Rhodes were telling the truth, Jane's body most likely would not have resurfaced with such speed.

Finally, Rhodes notes but does not argue in his brief that he was entitled to an evidentiary hearing under 28 U.S.C. § 2254(e)(2). Under United States Supreme Court precedent, "where an applicant for federal habeas relief is not barred from obtaining an evidentiary hearing by 28 U.S.C. § 2254(e)(2), the decision to grant such a hearing rests in the discretion of the district court," and, where as here, "the District Court determined that respondent could not make out a colorable claim," he is in turn, "not entitled to an evidentiary hearing." *Schriro v. Landrigan*, 550 U.S. 465, 468 (2007). Because Rhodes was unable to establish by clear and convincing evidence that but-for the alleged constiutitonal violation, no reasonable jury would have convicted, he has failed to make out a colorable claim under § 2254(e)(2)(B) and was therefore not entitled to an evidentiary hearing.

### III. Conclusion

For the foregoing reasons, we affirm the judgment of the district court.

_____